IN RE GUARDIANSHIP OF CHERIE RAE PLUCAR.

ERNEST WIENANDS et ux., appellants, v. H. R. PLUCAR et ux., appellees.

No. 48762.

(Reported in 72 N.W.2d 455)

October 18, 1955.

Rehearing Denied December 16, 1955.

Newman, Newman & Redfern, of Cedar Falls, for appellants.

Roy Wagner, of Waterloo, for appellees.

GARFIELD, J.—This is a controversy between maternal grandparents of an 8-year-old girl and her surviving father and present wife over the right to the child's custody. The grandparents, whom we call plaintiffs, ask that they be appointed guardians of the child's person and property and granted custody and control of her. The father and his present wife, whom we call defendants, appeared generally in the action and by answer resisted the granting of relief. Following trial, relief was denied and plaintiffs have appealed.

Since the right to the child's custody is the principal matter in controversy it would seem our review should be de novo under the rule adopted in Jensen v. Sorenson, 211 Iowa 354, 367, 233 N.W. 717, 723, and subsequently adhered to many times. While the cited case was an action in habeas corpus it also involved the appointment of a guardian and a decree of adoption. We there said:

"V. The appellee urges upon us that the case is not triable de novo, and is reviewable on errors only. Where the issue turns upon the best welfare of the child, and involves the overturning of presumptive parental rights in the interest of the child, we have found it difficult to separate questions of law from questions of fact, and have found ourselves unable to adhere very strictly to the rule contended for by appellee. We have necessarily recognized the fact that the determination of such issues carries us into the field of equity, and that it is indispensable that principles of equity be applied."

In re Adoption of Perkins (Wennerstrum, J.), 242 Iowa 1374, 1378, 1379, 49 N.W.2d 248, 250, holds, largely by analogy to the rule stated in Jensen v. Sorenson, supra, that adoption proceedings are reviewable here de novo. The dissenting opin-

ion of Justice Smith disagrees with this holding but points out that equity has always had jurisdiction over the custody of minors. (See page 1387 of 242 Iowa, page 255 of 49 N.W.2d.) Knochemus v. King, 193 Iowa 1282, 1285, 188 N.W. 957, and earlier habeas corpus actions involving child custody, cited by defendants, have not been followed insofar as they hold our review is not de novo. Finken v. Porter, and citations, 246 Iowa 1345, 72 N.W.2d 445.

However, if the case were reviewable only on errors the result here would be the same since we are clear the trial court committed reversible error in one or more respects.

There is practically no dispute in the controlling facts. The child, Cherie Rae Plucar, was born April 11, 1946. Her mother Dorothy Plucar died two days later. A few days thereafter her father, defendant Hollis R. Plucar, carried the newborn child from the hospital to the home of Dorothy's parents, plaintiffs Ernest and Cecelia Wienands, where she lived continuously until September 6, 1954, when defendants, by trick and deceit, took her to Houston, Texas, to which city they had just moved. This action was then forthwith commenced.

During the nearly 8½ years Cherie Rae made her home with plaintiffs Hollis never contributed a dollar to her care or support, notwithstanding assurances by him at the outset that he would pay for her food and clothing. For the first 18 months Hollis paid into a trust fund $13.50 per month to be used for the child's higher education. These payments came from a government pension Hollis was then receiving and a refund of social security taxes paid by Dorothy. Plaintiffs have kept the fund intact despite efforts by Hollis to withdraw it.

On her deathbed Dorothy asked her mother to take the child and raise her as her own. This the grandmother promised to do. Hollis also requested the grandmother at the outset to take Cherie and she promised him she would do so if Hollis would buy her clothes and food.

When the child was six months old the grandmother told Hollis, who had moved to Omaha, if he was ever going to take the child he should do so then since she was getting strongly attached to her. Hollis replied, "This is where I want the child

and this is where she should be." In August 1947, when Cherie was some 16 months old, Hollis told Mrs. Wienands he wanted the child. She reminded him of their talk the year before and said she could not give her up. Hollis then consulted an attorney of his own choosing and told the grandmother if she and her husband would take full responsibility for Cherie and pay all her expenses so there would be no charges against him, he would give them "papers on the child." Hollis then wrote out and gave Mrs. Wienands this paper with the assurance that when he next returned he would give her a more formal one:

"I, H. R. Plucar, real father of Cherie Rae Plucar, do hereby authorize Ernest and Cecelia Wienands to care for Cherie Rae until such time as Cherie Rae decides for herself to either remain or live with me.

"I will be allowed to see her when I wish, also W. R. Conrad and Cynthia Plucar can see her any time they wish.

"There will be no charges at any future date for her care. Ernest Wienands can take exemption for her for federal income tax.

"This agreement is only temporary and will be considered void if and when a notarized agreement is filed with both parties.

/s/ Hollis R. Plucar"

A few days later Hollis and Mr. and Mrs. Wienands signed a more formal paper prepared in duplicate by an attorney chosen by Hollis. Hollis kept one of the signed duplicates, the Wienands kept the other. This agreement reads:

"Agreement This agreement made in duplicate between H. R. Plucar, father of Cherie Rae Plucar, a minor, and Ernest and Cecelia Wienands, maternal grandparents of the minor, Witnesseth:

"H. R. Plucar does by this agreement give and surrender the care, custody and control of said minor to said Ernest and Cecelia Wienands for such a time as said minor shall decide either to remain with said grandparents or to live with her father.

"It is agreed said grandparents shall give said minor proper

care and attention and at their own expense clothe, feed and shelter said minor and give her necessary medical attention and aid and to pay all expense of her attendance at school, if any.

"It is agreed the father, H. R. Plucar, and W. R. Conrad and Cynthia Plucar can visit said child at any reasonable time. It is further agreed the father, H. R. Plucar, shall not claim said child as a dependent for federal income tax purposes and said grandparents shall have the right to such claim.

"IN WITNESS WHEREOF we have set our hands this 30th day of August, 1947.     /s/   H. R. Plucar
/s/   W. R. Conrad         /s/   Ernest Wienands
        Witness            /s/   Cecelia Wienands"

It is conceded Cherie never indicated a desire to live with her father. It conclusively appears the Wienands gave her proper care and attention and in other respects faithfully discharged their obligations under the above agreement. The trial court held that because under the agreement defendants' right to the child's custody could be terminated by her election to live with her father it was a mere temporary arrangement and the father did not intend to grant plaintiffs permanent custody.

We think the trial court was in error as to the meaning of the above agreement when considered in the light of undisputed facts. Hollis himself testifies the Wienands "wanted some sort of a written agreement giving them custody and control, practically the same as just giving her up completely." The agreement in effect gives and surrenders the care, custody and control of the child to the grandparents until such time as she should decide for herself not to live with them. This time never arrived. Until such time, if it ever came, the Wienands obligated themselves to assume the role of parents, to give Cherie proper care and attention, provide her with a home at their own expense and to defray the cost of her schooling. She would not arrive at school age for at least four years.

The subsequent conduct of the parties shows they regarded the agreement as no mere temporary arrangement, revocable at will by Hollis. For more than seven years after the agreement was made Hollis permitted plaintiffs to continue to make a home for Cherie at their own expense. During all this time the

bonds of mutual affection between the child and her grandparents continued to grow stronger and the child became firmly rooted in their home.

It was nearly six years after the agreement was signed before a request was made to take the child from her grandparents. And this request was not made by Hollis to plaintiffs. Hollis' present wife, in the summer of 1953, asked Mrs. Wienands if they could take Cherie to Texas for a while and keep her, provided she liked it there. Mrs. Wienands refused. On this same visit Hollis asked his daughter to go to Texas but she did not want to go and was upset at the thought of doing so.

September 6, 1954 (Labor Day), Hollis and his wife were visiting his mother in Black Hawk County. Hollis invited the Wienands and Cherie to come over for ice cream and cake and they accepted. Under the pretext that he was going to get the ice cream, Cherie was induced to enter her father's automobile and spirited away to Texas. Hollis admits the child was upset at being taken away.

There is uncontradicted evidence that Hollis paid little attention to Cherie and showed little affection for her when he occasionally saw her on his visits to Black Hawk County. He apparently visited his mother there every summer, sometimes more often.

█ █ We have frequently held the right of a surviving parent to the custody of his child may be relinquished by abandonment, contract or otherwise. Finken v. Porter, supra, 246 Iowa 1345, 1348, 72 N.W.2d 445, 446, and citations. We are agreed that in view of the agreement and uncontroverted evidence as to the conduct of the parties Hollis relinquished the right to his child's custody.

█ We have also frequently refused to enforce the right of a surviving parent to his child's custody where the best interests and welfare of the child call for other care and custody. Finken v. Porter, supra, and citations. The trial court held the paramount question for determination was what is for the best interests of the child and found they would be served by placing the child with her father. We can find no substantial evidence to support this finding. It is clearly against the weight of the testimony and seems to rest entirely on a surviving parent's

presumptive right of custody. We think the only conclusion reasonable minds may fairly reach under this record is that the best interests and welfare of Cherie will be subserved by returning her to her grandparents.

Several credible witnesses vouch for the good home the Wienands have, the neatness and cleanliness with which it is kept, and the loving care shown Cherie. One close aquaintance testifies, "I observed the care given Cherie and it couldn't have been better. She received every bit of love any child could have. She was always clean and the house was nice. * * * Cherie seemed to feel very secure and happy. She was dressed very nicely and in good taste."

The child had a room of her own in plaintiffs' home and a large yard in which to play with many neighbor children of her age. Her school was only three blocks away. She attended church and Sunday school regularly with plaintiffs. Cherie was healthy. She called Mrs. Wienands "Mommy." She sometimes called Mr. Wienands "Daddy", sometimes "Grandpop." The Wienands are in good health. Mr. Wienands has a good job in a Ford garage. He had worked for one employer 20 years. They reared two children of their own.

There is no dispute about any of these matters. Hollis' complaints against the Wienands are comparatively trivial. One is that the clothes she wore "seemed a little old for the child." The criticism comes with ill grace from one who did not see fit to provide his only child with any clothing for nearly 8½ years.

A second complaint Hollis makes is that he was not notified when the Wienands moved to California for three years in 1948, taking Cherie with them. It is shown without dispute, however, the Wienands did not then have Hollis' address and that Hollis' mother and uncle had full knowledge the Wienands planned to leave Iowa. Plaintiffs were justified in assuming Hollis would learn from his mother of their plans to leave and he admits he heard from his mother that the Wienands were going to California. In 1949 the Wienands and Cherie were back in Iowa and visited Hollis' mother several hours. Mrs. Wienands testifies without contradiction, "Hollis (who was

then living in Black Hawk County) was there when we arrived but only stayed a few minutes and left. He paid very little attention to the child and didn't hold her or kiss her or anything."

There was no witness for defendants except Hollis. His present wife was not present at the trial and presumably the trial court never saw her. The only testimony regarding Hollis' recently acquired home is his own: "We have a home in West University Park, Houston, Texas. I have a large equity in it. It has five rooms and bath with a double garage and breezeway. Cherie has her own bedroom. It is in a very good neighborhood." There is no showing as to proximity of the home to school, church or playground.

Hollis testifies the principal of the school Cherie attended told him she was the top one in her class. This is at least something of a testimonial to the care and devotion plaintiffs gave the child until she was taken to Houston.

One piece of Hollis' testimony we find scarcely possible to believe is that shortly before he spirited Cherie off to Texas a district judge advised him "there was no reason he shouldn't just take her. He said 'Go ahead and take her.' "

The above is a sufficient reference to the evidence. As previously indicated, we think it affords insufficient support for a finding that the child's best interests are furthered by awarding her custody to her father as against her grandparents. Such a decision works a cruel injustice to the Wienands and, what is more important, to Cherie herself whose welfare is of primary concern.

We feel it is fundamentally wrong to take this child from the home to which it has become so strongly attached and award her custody to defendants. Her father was content to leave her with her grandmother at birth when constant care was necessary to her life. The grandparents faithfully cared for her nearly 8½ years and did an excellent job. There is no evidence to the contrary. Plaintiffs' right of custody was not revocable at the father's pleasure. He chose to take an extended holiday from the responsibilities of parenthood and at this late day he has no just claim to his child's custody either in law or morals.

In support of these views see Scheffers v. Scheffers, 242 Iowa 563, 570, 571, 47 N.W.2d 157, 161, and citations.

This oft-quoted language from Jensen v. Sorenson (Evans, J.), supra, 211 Iowa 354, 364, 366, 233 N.W. 717, 722, will bear repeating here: "It is important, as we have often said, that the custody of a child should be determined promptly, and that it should be permanent. * * * It should not be too readily transplanted. * * * For three years this child has been growing in the Sorenson family, and has found affection there. In our judgment, no adequate reason is shown in the record for a change of custody, unless it should be held that the father has a primary right to such custody. * * * It is our opinion that the welfare of this child requires that it remain where it is."

Since the child's custody should have remained with plaintiffs it was a clear abuse of discretion not to appoint them guardians. Ordinarily the right to custody of a minor and guardianship over it rests in the same person or persons. See In re Guardianship of Lancey, 232 Iowa 191, 197, 2 N.W.2d 787, 790; In re Adoption of Burkholder, 211 Iowa 1222, 233 N.W. 702; Burger v. Frakes, 67 Iowa 460, 23 N.W. 746, 25 N.W. 735. Cherie is the owner of a trust fund of a few hundred dollars. Section 668.3, Code, 1954, provides "If a minor owns property, a guardian must be appointed to manage the same. * * *."

We have uniformly held Code sections 668.1, 668.2, which say a surviving parent becomes the natural guardian of his minor children and entitled to their custody, do not provide for an absolute right in the parent but only a presumptive right which must give way where it has been relinquished or where the welfare and best interests of the child call for other custody. In re Guardianship of McFarland, 214 Iowa 417, 428, 239 N.W. 702, and citations; Lursen v. Henrichs, 239 Iowa 1009, 1013-1015, 33 N.W.2d 383, 385, 386; Joiner v. Knieriem, 243 Iowa 470, 478-480, 52 N.W.2d 21, 26, and citations.

We have deemed it proper to consider carefully the question of jurisdiction although no such question has been presented to us. Defendants' counsel appeared specially in the trial court for them and for Cherie Rae for the purpose of attacking its jurisdiction, mainly on the ground defendants had been residents of Harris County, Texas, in which Houston is

situated, since August 31, 1954 (about ten days before this action was commenced). The special appearance was overruled. Hollis and his present wife, by counsel, then appeared generally to the action and Hollis was present throughout the trial. There was no further challenge to the trial court's jurisdiction and there has been none to ours. Defendants' counsel stated in argument to us that they had submitted to the jurisdiction of the Iowa courts.

In deciding the case the trial court on his own motion again considered the question of jurisdiction and held there was no lack thereof since the domicile of the child was in Black Hawk County notwithstanding she had been taken to Texas a few days before the action was commenced. We agree there was no lack of jurisdiction.

The annotation to Beckmann v. Beckmann, 358 Mo. 1029, 218 S.W.2d 566, 9 A. L. R.2d 428, 434, at 442, states: "Where there is no outstanding judicial award of custody by a foreign court, the courts are unanimous in holding that even though the children may be physically without the state, power in the court exists to make an award of custody of children domiciled within the state." Numerous decisions are cited to support the text.

39 C. J. S., Guardian and Ward, section 10, says: "* * * power to appoint [a guardian] may rest on domicile notwithstanding the absence of the infant from the territorial jurisdiction of the court at the time the appointment is made, * * *." To like effect is 25 Am. Jur., Guardian and Ward, section 25.

Restatement, Conflict of Laws, section 117, states: "Guardianship of the Person. A state can exercise through its courts jurisdiction to determine the custody of children or to create the status of guardian of the person *only* if the domicil of the person placed under custody or guardianship is within the state."

Some decisions are not in accord with the above statement because of the presence in it of the word "only" which we have italicized. It is sometimes held to be desirable to determine the custody of children found within the territorial jurisdiction even though their domicile is elsewhere. Helton v. Crawley, 241 Iowa 296, 41 N.W.2d 60, is such a precedent. It does not

conflict with our views here. If the word "only" is omitted from the above statement, and for our purposes here it may be omitted, there is no lack of support for the statement. It does not follow from the fact that questions of custody may sometimes be decided in a state where a child is found that like questions may not be determined in the state of the child's domicile.

Restatement, Conflict of Laws, section 149, says: "The status of guardian and ward is created and terminated by the state of the domicil of the ward."

We have held several times that the court of the child's domicile has jurisdiction to appoint a guardian for him. Jenkins v. Clark, 71 Iowa 552, 555, 32 N.W. 504; In re Guardianship of Benton, 92 Iowa 202, 205, 60 N.W. 614, 54 Am. St. Rep. 546; Smidt v. Benenga, 140 Iowa 399, 404, 118 N.W. 439; In re Guardianship of Prehoda, 194 Iowa 308, 189 N.W. 719. And we have so held even though the child was not at that time residing in this state (In re Guardianship of Johnson, 87 Iowa 130, 134, 54 N.W. 69) or was residing in another county in Iowa (Jenkins v. Clark, supra).

Nor was it error to hold the child's legal domicile was in Black Hawk County, Iowa. Ordinarily a minor whose mother is dead has the domicile of its father. Helton v. Crawley, supra, 241 Iowa 296, 306, 41 N.W.2d 60, 67. However, this rule rests upon the idea of parental custody of the infant and when the reason for the rule fails the rule is not applied. State ex rel. Rankin v. Peisen, 233 Iowa 865, 872, 10 N.W.2d 645, 648, and citations.

Where both parents die and the child makes its home with its grandparents who act in good faith it acquires the domicile of the grandparents. In re Guardianship of Benton, supra, 92 Iowa 202, 205, 206, 60 N.W. 614, 54 Am. St. Rep. 546; In re Hall's Guardianship, 235 N. C. 697, 71 S.E.2d 140, 32 A. L. R.2d 856, 862, and annotation 863, 869. Jensen v. Sorenson, supra, 211 Iowa 354, 366, 367, 233 N.W. 717, 723, quotes our decision to such effect from the Benton case and goes on to hold "The same rule should logically be applied where one parent is dead, and the other has abandoned the child or forfeited his custodial right."

Jensen v. Sorenson, supra, in turn is followed in In re Guardianship of Lancey, supra, 232 Iowa 191, 195, 196, 2 N.W.2d 787, 790. See also 17 Am. Jur., Domicil, section 60, which states: "The rule arbitrarily attaching the father's domicil to the child has been modified in case the father has abandoned the child."

We have held the child's father here, in effect, abandoned her and relinquished to plaintiffs his custodial right. As stated, the child lived with plaintiffs nearly 8½ years. There is no doubt plaintiffs acted in the best of faith. Upon the above considerations the child acquired the domicile of her grandparents in Black Hawk County.

The same result may be reached by other reasoning. Restatement, Conflict of Laws, section 33, deals with the domicile of a child who has been abandoned. Comment a thereunder says, "* * * If the child is abandoned by its father and does not live with its mother * * * it retains the domicil of the father at the time it was abandoned by him."

The domicile of Cherie's father at the time she was abandoned by him was in Black Hawk County and upon the authority just cited she retained that domicile.

Plaintiffs are entitled to an order appointing them guardians of the person and property of their granddaughter and judgment granting them custody and control of her. For the entry thereof this cause is—Reversed and remanded.

All JUSTICES concur.